Rose *vs.* Izard.

---

HEARD NOVEMBER TERM, 1876.

## ROSE *vs.* IZARD.

In 1856 A, B and C purchased a rice plantation, with all the slaves, stock, implements and other personalty belonging thereto, each paying one-third of the purchase money. The title was taken in the name of A for the use of himself, B and C, and their heirs; and they then made an agreement for the cultivation of the plantation for their common benefit. This was done for a number of years, and debts were contracted, some of which A paid with his individual funds, and B and C each gave a mortgage of his interest in the plantation to secure the payment of a debt contracted by himself individually: *Held,* That a partnership for the cultivation of the plantation for their common benefit existed between A, B and C, and that the equity of creditors of the partnership, of whom A was one, was superior to that of the mortgages of the individual shares of B and C.

BEFORE GRAHAM, J., AT CHARLESTON, MAY, 1874.

These were two bills in equity—one filed July 18, 1867, by James Rose, Henry Gourdin and William C. Bee, executors of

Thomas Alston Coffin, deceased, against Joseph A. Huger, Arthur M. Huger, Allen S. Izard, James R. Pringle and James Rose Coffin, to foreclose a mortgage given by Joseph A. Huger to George M. Coffin, deceased, and James R. Pringle, of his one undivided third portion of plantation called "Clydesdale;" the other filed July 22, 1869, by Charles T. Lowndes against Arthur M. Huger, A. S. Izard, James Rose, H. Gourdin, L. McLain, W. C. Bee and James R. Pringle to foreclose a mortgage given by Arthur M. Huger to Richard H. Lowndes of "his one-third interest in the plantation called 'Clydesdale.'"

The two bills were tried together, and the case, briefly stated, is as follows:

"The property known as Clydesdale consisted of a large rice plantation lying on the Savannah Back River, in Beaufort County, South Carolina, a number of slaves, stock, implements and other personalty necessary for the cultivation of rice. It was formerly owned by the Hon. D. E. Huger, who, by his will, empowered his executors (Daniel E. Huger, John M. Huger, Joseph A. Huger and Arthur M. Huger) to sell the same. On the 8th day of January, 1856, the said executors sold Clydesdale, with all the slaves, stock, implements and appurtenances thereto belonging, to J. Allen S. Izard, who purchased for the joint benefit of himself and the said Joseph A. Huger and Arthur M. Huger. The purchase money was paid by the three purchasers, each paying one-third thereof out of his separate and individual funds. No conveyance of the property was made until the 1st day of March, 1858, when the four executors executed an indenture whereby they conveyed it to the said Allen S. Izard, "to have and to hold the real estate to him, his heirs and assigns," and the personal estate to him, "his executors, administrators and assigns, to the following uses, that is to say: all the estate, real and personal, hereby conveyed, or intended so to be, to the use of the said Allen Smith Izard, Joseph A. Huger and Arthur Middleton Huger, parties to these presents, and to their heirs, executors and administrators, according to the nature of the several estates, forever."

The mortgage of George M. Coffin and James R. Pringle bore date the 9th day of February, 1860, and was given to secure the payment of three bonds of same date in the aggregate sum of $25,000. The bill in this case alleged that the bonds were given

for moneys loaned by Coffin and Pringle to Joseph A. Huger, who applied the same to the payment in part of his portion of the debt due for Clydesdale.

The mortgage of Arthur M. Huger to Richard H. Lowndes bore date the 6th day of November, 1865. It was given to secure the payment of a bond for $10,000, bearing the same date, and it was alleged in the bill of the complainant, Charles T. Lowndes, that the said bond and mortgage were given in lieu and as a substitute for another bond and mortgage given in March, 1856, which had been lost or destroyed in the city of Columbia, February, 1865.

· The allegations of the bill of C. T. Lowndes and the rest of the case will be sufficiently understood from the answer of Allen S. Izard to the bill of C. T. Lowndes. It is as follows:

"That in the first days of the year 1856, or just before, he agreed with his brothers-in-law, Joseph A. Huger and Arthur M. Huger, to enter into the joint adventure and join with them to purchase a large and valuable estate, real and personal, consisting of one hundred and forty negro slaves, a valuable plantation, "and all the stock, utensils and everything of the nature of personal estate used with or attached to the said plantation," situate on Savannah Back River, St. Peter's Parish, Beaufort District, South Carolina, and known as the "Clydesdale Estate," belonging to the estate of the late Hon. Daniel Elliott Huger, the father of his said associates, and also the father-in-law of this defendant and of the complainant, Charles T. Lowndes. The purpose and object of their association and enterprise was to plant, cultivate, produce and send to market and sell for profit, crops of rice.

"That the purchase of said estate was completed on the 8th day of January, 1856, the same having been knocked off to this defendant as the highest bidder at auction, and sold to him all together in one parcel and lump, or, as it was called at the time, "*en bloc*," for the sum of one hundred and eighty-eight thousand dollars, ($188,000.) On the next day they agreed among themselves as follows:

"Articles of agreement between Allen S. Izard, Joseph A. Huger and Arthur M. Huger, joint owners of Clydesdale plantation and negroes, Savannah Back River, Beaufort District, South Carolina:

"Joseph A. Huger to be charged with the management of the plantation.

"Messrs. William C. Bee & Co., factors, of Charleston, under the advisement of Arthur M. Huger, to be charged with the management of the accounts and supplies. All connection with the city of Savannah, Ga., to be avoided as far as practicable; if resorted to from necessity, the transactions to be always on the cash basis. On all points involving the management or general interests of the concern, Allen S. Izard will be required to act as adviser, and in case of difference between the other parties, to be umpire. "CHARLESTON, 9th January, 1856."

"Soon after the said purchase, personal property to the amount of $40,000 was purchased for account of the joint adventure and became a part of it; and this amount, with the purchase hereinafter referred to, amounting to $26,000, increased the joint property to the value of $254,000 or more, of which the greater part in value at that time was personal property.

"One of the said executors being absent from the State was specially represented in the negotiation of this transaction, and in the administration and settlement of said estate, by the complainant, Charles T. Lowndes. Of this joint purchase, the intent and purpose of it, and the motive power inducing it, the complainant had as full and complete knowledge as this defendant, he being at the time the confidential friend and adviser of the parties; and as to the above recited agreement, this defendant thinks he has understood, and that it will so appear, that the complainant himself was consulted and prepared or framed the same. But this defendant does not allege this as of his own knowledge.

"This defendant and his associates in this joint enterprise each had, besides, his respective separate estate or business, to the management of which his attention and services were directed, Joseph A. Huger's property being next adjoining to "Clydesdale," the joint property.

"The enterprise being thus started and in successful operation, this defendant went abroad and was absent from the United States in 1857 and 1858, during the seasons in which the crops of those years were made.

"During his absence, he has understood and believes that on the first day of March, A. D. 1858, more than two years after the purchase, "the purchase money aforesaid having been in due form secured to the uses of the testator's will," the executors of the late

Daniel Elliot Huger did, by way of and in the form of an indenture of bargain and sale, prepared by the late Mr. Petigru, representing all parties, between them of the first part and this defendant of the second part, bargain and sell to him the whole of said estate, together consisting of the aforesaid Clydesdale plantation, one hundred and forty (140) negro slaves, and all the stock, utensils and everything of the nature of personal estate used with or attached to the said plantation, in trust for the use of himself and his associates, the other parties to the above recited agreement of 9th January, 1856, viz., Jos. A. and Arthur M. Huger, that is to say, as this defendant understands it, to the uses of their association, contemplated by the informal agreement of 9th January, 1856. The said indenture, he has understood, was duly recorded, and without his becoming a party thereto; nor has this defendant, to the best of his recollection, knowledge or belief, ever become a party thereto by any formal act or deed of his own, or by the act of any one duly authorized in his name. If it is understood that the conveyance in said deed is to the use of the association formed and agreed upon between himself and Joseph A. and Arthur M. Huger, at and before the purchase, and upon the faith and inducement of which the purchase of the 8th January, 1856, and the subsequent purchases were made, then this defendant is well content to be a party thereto. This defendant does not believe that Mr. Petigru, nor any one in the absence of this defendant for him, ever contemplated that he was to accept a title to said property in trust for any other purpose than as he has indicated and understood. It was never, he believes, intended that he should be held liable for the debts incurred for the property held in trust by him while the property itself should be applied to the relief of the outside individual debts of his partners.

"And this defendant further says that, during his said absence, and without the opportunity to advise with him, in 1858, a large debt, to the amount of twenty-six thousand dollars, ($26,000,) was contracted by his associates or copartners for the purchase of negro slaves on a credit of ten years, which slaves were put on the Clydesdale estate and became a part of the joint property. This defendant has always felt that if he had been present he would not have advised said purchase, and he especially regretted the long credit taken thereon, which he deemed, as it certainly was, unnecessary, and especially so as to himself. Whether the complainant was con-

sulted as to the policy and advisability of this transaction, and whether he advised it, this defendant cannot undertake to say ; but that the complainant had full notice of it cannot be doubted, because he, the complainant, Charles T. Lowndes, became one of the sureties on the bond given in this defendant's absence for said purchase, which said bond fell due in 1868, and this defendant has been compelled to pay the same, amounting to about thirty-three thousand dollars, ($33,000.) But this defendant succeeded in making a very advantageous arrangement, by which about one-third of the amount was saved to the partnership, and the partnership is still indebted to him for the amount he did actually pay or caused to be paid.

"And this defendant further says that, besides the aforesaid debt, he has been compelled to pay and has paid, or caused to be paid, other debts of the joint concern or partnership, amounting in all to the sum of about and not less than the sum of $25,000, and there is still a small amount due, not exceeding the sum of $2,000, which he is liable for and expects to pay, making an aggregate of about $50,000 due by the partnership and chargeable upon partnership property, which property he is advised and believes neither he nor any of his partners had or have any right to divert from or apply to any other purpose than the payment of these partnership debts. That having paid them he is advised he is entitled to stand in the place of the original creditors, and, upon a statement of a partnership account, which he is at all times ready to make and establish, it will appear, as above stated, that he is largely in advance to the joint concern, which said advances are chargeable upon the joint property in his possession. That all the personal property was destroyed and lost during the war, and at its close there only remained the lands. That the personal property now thereon and necessary to their cultivation has been contributed by this defendant. That the first year of cultivation after the war, namely, 1866, the property was very unfortunately and unsuccessfully managed and fell greatly in debt. That the whole present debt, except that first referred to, contracted in 1858, was created by expenses during the war and losses since, but chiefly by losses incurred during the year 1866. That the last year was comparatively successful, and the present year will, this defendant hopes, somewhat reduce the debt when the crop shall be sent to market and sold.

"This defendant believes that under good management, and with prices for crops such as have generally ruled since the war, the partnership debt can be paid entirely, and the remaining capital saved from the war, namely, the lands, restored to the partners, to be applied to payment of their private or individual debts.

"He is confident in the belief that, under skillful or fortunate management since the war, the whole debt might have been paid for by or before this time.

"He admits it to be true, as alleged, that one of his partners, Joseph A. Huger, has become bankrupt, and his rights and interests have passed to his assignee. The other partner is unable to pay his debts, but is devoting his time and services, in conjunction with this defendant, to the management of the partnership affairs and estate, in the rational hope thereby to retrieve his fortunes and pay all his just debts.

"This defendant, further answering, says: That as to the alleged borrowing of the sum of $10,000 by his co-defendant, Arthur M. Huger, from Richard H. Lowndes, and the guaranty thereof by the complainant, he does not doubt the same to be true; but when it was borrowed, and whether the money thus borrowed was used to make up his co-defendant's share of the capital put into the Clydesdale adventure, and applied to payment of that purchase, this defendant is ignorant and cannot answer; nor does he understand that it is of any consequence to this defendant, or to any one else to be known, unless to entitle the said R. H. Lowndes, or the complainant in his place, if he be substituted to his rights, to come in as the owner of so much capital contributed, and thereupon claim his share of the partnership rights, benefits and burdens, a proposition to or from which this defendant need not assent or dissent in any great haste. This defendant does not doubt that the complainant has, as he alleges, paid the several sums of money in behalf of his co-defendant, Arthur M. Huger, but it is not within his personal knowledge.

"As to the making of the mortgage of 1865, now attempted to be set up and foreclosed, this defendant had no notice or knowledge of it till after it was made, nor did he before that time have any notice or knowledge of the alleged prior mortgage said to have been advised and prepared by the late Mr. Pettigru, and alleged to have been executed in March, after the purchase of Clydesdale, which was in 1856, and believed by complainant to have been

recorded and afterwards lost or destroyed at Columbia in February, 1865, and for which prior mortgage the new mortgage of 1865 is the alleged substitute.

"This defendant has lately heard a different account of this alleged prior mortgage, but, as he cannot answer from any knowledge of his own, he prays that strict proof may be made of the making, of the date, of the contents, of the execution, of the witnesses thereto, of the recording, and of the loss of the said prior mortgage.

"This defendant, further answering, says: That it is true the late Mr. Petigru was, in all the transactions connected with the sale and purchase of Clydesdale, and the arrangements thereabout between this defendant and his associates, the solicitor and confidential adviser of the executors of Judge Huger, two of whom were Joseph A. and Arthur M. Huger, and of this defendant and of the complainant, Charles T. Lowndes; that he was not only, as alleged, a person of great learning in the law, and most cognizant in that respect of the title of Arthur M. Huger, but also a man of singular personal honor and professional punctilio; that he was also the solicitor and friend of the trustees of Mrs. Hamilton, to whom the debt of 1858 for the purchase of negroes was made, and of this defendant and his partners, and represented all the parties to that transaction. And these things considered, it is not easy to believe that, thus representing all parties, he did, soon after January 8th, 1856, more than two years before there was any title therein, or that after the 1st March, 1858, the date of title, suggest, aid and influence Arthur M. Huger to mortgage his share of the joint enterprise, unless subject to the results thereof, regardless of the interests and rights of some of his friends and clients, and in favor of one only of them.

"And this defendant, further answering, says: It is true, as alleged, that he does set up and claim that his association with Joseph A. Huger and Arthur M. Huger was a partnership, and the purchase of Clydesdale was a partnership adventure, and the business carried on by himself and his associates in planting, cultivating, producing, sending to market and selling for profit crops of rice was and is a partnership business, the liabilities and burdens of which the law will not allow him to escape from, and the protection of which the law will not take from him; that the capital put in by each partner was the one-third part of Clydesdale, by

which this defendant means, in this place and elsewhere that he has used or may use the term in this his answer, not only the land, but also the personal property of whatsoever nature, just as it was bargained and sold and has been and is held in one undivided parcel. That he is and has been made to be liable for debts contracted for the concern by his partners, whether with or without his knowledge or consent, and for losses made and debts contracted thereby under the management of his partners, in which he did not participate, and for which debts and losses, as he has before stated, he is now out of pocket or liable for about the round sum of $50,000. It is quite true that he does claim that while, and so long as, his partners may, in the management of the partnership, commit him to liability for losses and debts, they cannot, without his consent, lawfully withdraw or mortgage their capital, to apply and pay it or secure it to the payment of their respective private or personal debts, leaving the partnership debts and losses unpaid and unprovided for. And all this he does, pretends, sets up and claims, not of his own judgment of the effect in law of his agreement and dealing in respect of Clydesdale, but because that when called upon to pay the whole losses, where he had supposed he was only liable for his equal share, he has been advised and convinced by lawyers of long experience and standing in their profession, both in the State of Georgia and in this State, that he could not escape liability, and also that he would be protected, to the extent of the partnership property, to save him from more than his share of loss.

"This defendant, in joining in the joint adventure, did precisely what he intended to do, but he did not know or understand the effect thereof in law, or what name or what liability in law would attach to such transactions.

"He desires nothing, and would not have knowingly anything, that is unfair or unjust, or even hard upon any one; and if it were a question of hardship only, and not of law only, between the complainant and himself, this defendant ventures to believe that the complainant himself would admit that his case presents, all the circumstances being considered, the greater hardship of the two.

"This defendant is advised and believes, and he claims that when the complainant shall have established his alleged first mortgage alleged to have been lost or destroyed and his alleged second or substituted mortgage, he will then only have established a lien (to which this defendant does not object and never has objected) upon

whatever Arthur M. Huger would be entitled to or what would remain to him of the partnership property after payment of part-nership debts; that the complainant is not and cannot be in any better position than if he had taken an assignment, by way of security, of the whole of Arthur M. Huger's capital or interest in the partnership, instead of a mortgage of his interest in a part only,—that being all Arthur M. Huger could lawfully assign or mortgage, and, as this defendant is advised, all that by a fair con-struction of his deed he has mortgaged. And as to the allegation of the complainant that he never knew nor heard of any copart-nership in this respect until 1867, this defendant ventures to think there is some mistake or misapprehension therein, because that the complainant was, as this defendant has already stated, fully cogni-zant of all the facts of the transactions and agreements between this defendant and his partners, in pursuance of which he bought "Clydesdale" for himself and them jointly in 1856, and the title of March 1, 1858, was made thereto, and, as a gentleman of fore-most sagacity and experience in business, he was better prepared to understand, and it is believed did better understand and judge of the effect in law of those transactions, than this defendant, who has no such claims to give value to his judgments of business or law, and who for many years greatly relied and rested upon the opinions of the complainant in such matters.

"And as to what the complainant did in fact think, some aid may be obtained from the single fact that in writing to this defendant, informing him of his successive alleged liens of mortgages from Arthur M. Huger to himself, he also clearly recognized the associa-tion of this defendant and Joseph A. and Arthur M. Huger as and by the name of a "copartnership." This defendant, as he has already said, did not then or previously so well understand the effect in law of his position with his associates, Joseph A. and Arthur M. Huger, as he has been taught it by the experience of the heavy and disastrous burdens it has cast upon him.

" This defendant further says that he understands and believes and hopes to prove that the accounts of the factors of the said "Clydes-dale" partnership were kept in the name of "Clydesdale Planta-tion" on their books, and that the drafts drawn by Joseph A. Huger, the managing partner, were in the name of and signed "Izard & Hugers," or "Hugers & Izard," and said factors were so well convinced and assured of the partnership and all of its

incidents and liabilities, that for advances made to and dealings with it they looked to this defendant's liability and to his funds in their hands for their protection and safety on the "Clydesdale Plantation" account.

"And this defendant does not admit that there ever was such a mortgage lien from Arthur M. Huger to the complainant as is alleged by the bill to have been made in March, 1856, soon after the purchase of Clydesdale, and said to have been recorded; and, if there ever was such a mortgage, he never had any notice thereof till he had notice of the alleged substitute executed at Greenville the 6th of November, 1865, now existing and set up; and he is constrained to deny that there was such a mortgage, because he has lately heard and believes that the paper referred to was in fact an informal instrument in the nature of an agreement, declaration or promise by Arthur M. Huger, without seal or witness, whereby he agreed generally to indemnify or secure the complainant against loss by reason of his large liabilities for him at that time, or some such like paper, and that it is a mistake to believe it was recorded, because a witness or witnesses and proof of execution by them or one of them would have been necessary before it could be recorded.

"And this defendant admits it to be true, as alleged, that the debt of Arthur M. Huger to him was, as is alleged by the complainant, created after the execution of his alleged substituted mortgage at Greenville as aforesaid. Said mortgage purports and is alleged to have been executed and delivered on the 6th day of November, 1865, and it is alleged, no doubt truly, that the same was duly recorded in the office of the Register of Mesne Conveyance for Beaufort District on the 9th day of August, 1866; and by reason of these alleged facts, and the law in such case made and provided, the said mortgage, even if otherwise it might be, cannot now be set up and prevail against a subsequent creditor, such as this defendant is charged to be and in fact is.     :

"And as to the allegation that this defendant stood by and allowed the complainant to deal with Arthur M. Huger and become liable for, or credit him upon, the security of his interest in Clydesdale, without giving notice of the partnership, the same has already been fully answered and denied hereinbefore, and is here repeated, namely: 1st, this defendant had no notice beforehand of his said dealings, liability and credit upon the security of Clydesdale; and, 2d, the complainant had as full, particular and complete knowledge

as this defendant had of each and every fact constituting the partnership, and he had, as has been seen, a much earlier correct judgment of the effect in law of these facts than this defendant.

"And as to the allegation that the complainant's rights in Clydesdale were the subject of *treaty* and *communication* between him and this defendant, and that this defendant, on such occasions, always treated the said mortgage as a valid mortgage of one-third of Clydesdale, not subject to any copartnership equity between him and his partners, Arthur and Joseph Huger; and that as late as December, 1866, this defendant requested the complainant to submit to a partition of Clydesdale and the allotment to Arthur Huger of a *divided* (*sic*) third part of the said Clydesdale.

" This defendant says that if any one or more or all of these allegations be true, the same,—namely, the treaty and communications, the treatment of the mortgage as free from all partnership equities, the request to submit to partition and allotment,—were all in writing, and not otherwise, and it is only necessary to produce the same and have the full benefit thereof, so far as the complainant may appear to be entitled to any benefit thereby, but this defendant by no means admits that it will so appear.

"And this defendant further says that when, about the same time, that is to say as late as or later than December, 1866, the complainant wrote to this defendant, informing him, he thinks for the first time, of the mortgage of Arthur M. Huger to him, the complainant, and while the complainant did, in fact, then already seem fully to understand that Clydesdale was " common property," and the contracts for and in its behalf " united " and " copartnership " obligations, this defendant was then of the opinion, so far as he could have any opinion upon a point he never had occasion to consider seriously, that he was only liable for one-third part of the debts, and no more, and that each of his associates was in like manner liable for one-third part of the debts, and no more; that each one's share of the property was liable and bound for his share of the debts only and for no more; in short, that there was no partnership.

" This defendant does not hesitate to admit, but he especially avows, that such was his view, and he maintained it till, without hope of success, he submitted, as already stated, under advice, to accept the burdens of a copartnership and began to claim the correlative protection incident to his case.

" The reciprocal change of opinions by the complainant and this defendant will not change or bend the law for or against either of them. All this defendant expects or hopes is the due administration and application of the law to his case and a cheerful submission to the result.

"As to the allegation that there is a mortgage by Joseph A. Huger of his share now held by the executors of the late Thomas A. Coffin, who are also made parties defendants, this defendant says that he has already some time since answered to the bill of the said executors heretofore filed and now pending in this honorable Court, wherein they set up such a mortgage against him and his just rights, and he need not here make further answer in that respect.

"And as to the prayer of the bill, this defendant says that upon a statement of the partnership account between himself and his partners each of them will owe him, he believes, about the sum of sixteen thousand dollars on partnership account, and he cannot with any certainty estimate the value of the partnership property, but he hopes and believes that it is fully equal to the amount of the debts, and more; and Arthur M. Huger's one-third interest mortgaged to the complainant is one-third of the partnership estate which may remain after payment of the debts, and the sale of *this* he does not object to, nor does he object to the sale in behalf of Arthur M. Huger of one-third of the property itself and the application of the sale money to the payment of one-third of what may be found due to this defendant by the partnership in the first place and the payment of the balance thereof to the complainant, or as this honorable Court may order and direct.

" This defendant was, before this suit, willing to go on with the partnership business until the debts should be paid—a result not difficult to accomplish, he thinks,—and after that to close partnership, his partners being thus enabled to pay the private debts charged by them upon their resulting shares or interests respectively. His judgment of the true interests of all concerned, and his distaste for and his aversion to law suits and conflicts of this sort, led him to greatly prefer such a course, so that through the labor and responsibility it imposed upon him he might aid in the payment of all the just debts of his friends and partners.

" He does not complain, but he does regret, that the complainant has taken a different view of his interests, and has chosen the chance of a contest for the establishment of his alleged rights, at

the close of which one or the other must lose, rather than the better chance that both should be paid in full after a while by the practice of some patience and forbearance.

"If this defendant could have had his choice, if it had been submitted to him to choose, he would have promptly chosen that the complainant and himself should both be paid their just demands without contestation or conflict. To assure this he was willing, and began to practice forbearance, patience and devotion of labor to the true interests of the complainant, of himself, of Arthur M. Huger and of all his creditors. This was the only necessity to assure the satisfaction of all. But he had no choice. He was only called on to yield his just rights and accept a disastrous loss. The complainant selects the uncertain chances of a little earlier payment through this Court at the expense of this defendant. He neglects and rejects the peaceful and well-grounded hope of payment for all without the stirring of disturbing questions. As this defendant has already said, not complaining, but regretting this, he comes here to meet the issue, which in vain he has avoided, and he has fully answered thereto."

Much evidence was given at the trial of the case which it is unnecessary to state. The decree of His Honor the Circuit Judge is as follows :

GRAHAM, J. These cases, as involving very nearly the same facts and points of law, were consolidated and ordered to be heard together. The facts are:

On the 8th of January, 1856, Clydesdale plantation, with the negroes, farming utensils, &c., was sold by Daniel E. Huger, John M. Huger, Arthur M. Huger and Joseph A. Huger, the executors of the late Judge Huger, to Allen S. Izard, a defendant in these cases, who purchased on behalf of himself and the said Joseph A. and Arthur M. Huger. The price was paid by the purchasers from their separate funds, one-third each. Some difficulties arose about this sale, and on proceedings had in the Court of Equity in the case of *Huger* vs. *Huger* (9 Rich. Eq., 232,) the sale was confirmed, and the title to Clydesdale plantation and the negroes, &c., was decreed to be vested in the purchasers. On the 9th of January, 1860, the last instalment of the purchase money was paid in full. On the 9th January, 1856, the day after the purchase, the purchasers entered into the following articles of agreement :

"Articles of agreement between Allen S. Izard, Joseph A. Huger and Arthur M. Huger, joint owners Clydesdale plantation and negroes, Savannah Black River, Beaufort District, S. C.:

"Joseph A. Huger is to be charged with the management of the plantation. Messrs. W. C. Bee & Co., factors of Charleston, under the advisement of A. M. Huger, to be charged with the management of the accounts and supplies. All connection with the city of Savannah to be avoided as far as practicable; if resorted to from necessity, the transactions to be always upon the cash basis. On all points involving the management or interest of the concern, Allen S. Izard will be required to act as adviser, and in case of difference between the other parties, to be umpire. Charleston, 9th January, 1856."

The original has been lost, and the copy produced and that set forth in Mr. Izard's answer are unsigned, but the testimony is that it was signed by the parties. On its execution it was delivered to Mr. Bee and by him deposited in his tin box and never taken therefrom, and has been destroyed in Columbia. There is no pretense that it ever was recorded, and no notice of it was brought home to either of the mortgagees in these cases.

On the 1st March, 1858, the executors of Judge Huger, among whom were Arthur M. and Joseph A. Huger, executed a title deed to Allen S. Izard of Clydesdale plantation and many negroes, the *habendum* and *tenendum* being, as usual, different as to each class of property, and the whole being to the said Allen S. Izard, "to the use of the said Allen S. Izard, Joseph A. Huger and Arthur M. Huger, and to their heirs, executors and administrators, according to the nature of their several estates, forever." This deed was recorded in the Secretary of State's office at Columbia on May 1st, 1862, more than four (4) years after its date, and was never recorded in the R. M. C. office for Beaufort District, where Clydesdale plantation is situated. Mr. Izard, however, knew nothing of this deed until after the war.

On the 9th January, 1860, Joseph A. Huger borrowed $25,000 from Coffin & Pringle and to secure the same executed three bonds and mortgaged to them "the one-third (undivided) portion owned by me, the said Joseph A. Huger, of all that plantation or tract of land known by the name of Clydesdale plantation, which said plantation is jointly owned by and was conveyed by the executors of the late Hon. Daniel Elliott Huger to me, Joseph A. Huger,

A. M. Huger and Allen S. Izard by a conveyance of date the day of , 185 ." Mrs. Huger renounced her dower on the mortgage on 6th February, 1860, and it was recorded in the R. M. C. office for Beaufort District on 11th February, 1860, and re-recorded there on the 4th May, 1867.

Before the war, viz., between 1856 and beginning of 1859, or perhaps even later, A. M. Huger gave to C. T. Lowndes a mortgage of his one-third of Clydesdale plantation, to secure him against liability incurred by him on behalf of A. M. Huger. There is no proof that it ever was recorded, and it was lost during the war. On the 6th November, 1865, A. M. Huger mortgaged to C. T. Lowndes "all my (his) one-third interest in the plantation on Savannah River, and known as Clydesdale." It contains this clause : " It is further understood, that this obligation is given not as any new or additional security given for the purpose stated in these presents, but in lieu of an instrument of same tenor and effect which was destroyed by fire in the destruction of Columbia in February, 1865." This mortgage was recorded 9th August, 1866, and actual notice of it given to Mr. Izard about the 1st January, 1867. The bills are filed to foreclose these mortgages respectively, and, among other things, pray for the partition of Clydesdale plantation and sale of the respective parts mortgaged, or, if it cannot be partitioned in kind, for the sale of the entire premises. Mr. Izard objects, and contends that Clydesdale is partnership property and responsible for partnership debts, of which there are some outstanding, before being responsible for these mortgage debts. Mr. Izard testified that till 1867 he had no idea of the existence of this alleged copartnership, and the declarations and acts of Joseph A. Huger and A. M. Huger show that till after this case arose they had equally little idea of its existence.

This renders it certain that as between themselves a partnership, the very basis of which is intention, never existed. The *animus coeundi* is wanting. But had there been one, the evidence satisfies me that no partnership as to Clydesdale plantation ever existed, and, if it did, it would not avail Mr. Izard. The legal title to the one undivided third part each was vested respectively in Joseph A. Huger, A. M. Huger and Allen S. Izard, and neither Coffin & Pringle nor C. T. Lowndes had notice of the alleged copartnership. As *bona fide* purchasers for value and without notice, they dealt with the holders of the legal title, and this protects them. As

regards the objection to Mr. Lowndes's mortgage not being recorded as required by the Act of 1843, relating to the recording of mortgages, I am of the opinion that as to the debts of A. M. Huger to Mr. Izard created between the date of the first mortgage and the 9th August, 1866, Mr. Izard is a subsequent creditor without notice. On the 9th August, 1866, the mortgage to Mr. Lowndes was recorded, and I hold now, as I have done in a previous case, that Mr. Izard had notice in law from that date. Mr. Izard had notice of it in fact on the 1st January, 1867. The debt of Mr. Huger to Mr. Izard created after the 9th August, 1866, cannot, under the Act of 1843, prevail against Mr. Lowndes's mortgage.

The solicitors of Mr. Izard moved to file the answer of Mr. A. M. Huger in the first named case. The facts in regard to this matter are:

The bill was taken *pro confesso* against Mr. Huger in his lifetime, and his solicitor applied to the complainant's solicitor to withdraw the order *pro confesso* and let the answer be filed. This was done, but the answer was never filed. With Mr. Huger's death the consent also died, according to the understanding of both solicitors. The executor and sole devisee of A. M. Huger were after his death made parties to these proceedings, but have filed no answers, and a judgment of *pro confesso* exists against them. The solicitors neither of the late Mr. Huger nor of his executor and sole devisee (his widow) asked that the answer be filed, and I overruled the motion. This answer and the answer of A. M. Huger, in the case of *Huger* ads. *King*, and also the letters of Mr. Huger to Mr. Herckenrath, of date 26th September, 1859, and of Mr. Lowndes to Mr. Izard, of date 26th February, 1856, were offered as testimony by Mr. Izard and objected to.

To the letters the objection was subsequently withdrawn. The testimony, as was also some of Mr. Lowndes's, was taken subject to objection. Both bills are *pro confesso* against A. M. Huger and his executor and sole devisee, and they do not raise the objection. I have decided that Mr. Izard was not a copartner of A. M. Huger, and hence he is not a survivor and the rule has no application to him. But whether Mr. Lowndes's testimony of conversation between A. M. Huger and himself were admissible or not by itself, it clearly becomes so if the declarations of A. M. Huger are put in evidence by Izard; and though, as a matter of law, the answers of A. M. Huger, as being declarations made *post litem motam* and without the

privilege to the other party of cross-examination, is inadmissible, yet as the argument discussed the entire testimony, and this view is most favorable to Mr. Izard, I have admitted them and considered the case as if the entire testimony were properly before the Court. It is, therefore, ordered and decreed that all the parties defendant to these actions claiming an equity of redemption or other interest in Joseph A. Huger's one undivided third part of Clydesdale plantation be barred and foreclosed thereof, and that the complainants holding the mortgages thereof are entitled to the same and all the right thereto appertaining prior to any claim of Mr. Izard's thereto as a partner. It is further ordered, decreed and adjudged, that all the parties defendant to these actions claiming an equity of redemption or other rights in A. M. Huger's one undivided third part of Clydesdale plantation be barred and foreclosed thereof, and that the plaintiff, C. T. Lowndes, is entitled by his mortgage of said one-third of Clydesdale to the same and all the rights appertaining thereto, in priority to all claims of Mr. Izard except the debts of A. M. Huger to Mr. Izard created between the date of A. M. Huger's mortgage to Mr. Charles T. Lowndes and the date of the record of said mortgage, viz , the 9th day of August A. D. 1866. It is ordered that the case be referred to Samuel Lord, Esq., as Special Referee, to take an account of and report the amounts due upon the bonds held by the plaintiffs, also of the rents, mesne profits and other proceeds derived from Clydesdale plantation since the filing of the bill in the first named cause, and more especially of the crops made on the said plantation and of the sales thereof, and of all expenses connected therewith, stating this account in such a way that whether it shall begin from the said date or the date of bankruptcy of Joseph A. Huger, or the filing of Mr. Lowndes's bill, the Court may use the same without further reference. He will also report the personalty on the said plantation and whether it is more advantageous to all concerned to divide the said plantation in kind or to sell the same as a whole.

It is further ordered that he do report the debts of A. M. Huger to Allen S. Izard created between the date of the first mortgage of A. M. Huger to C. T. Lowndes, which is uncertain, and which date the Referee is directed to ascertain and report, and the 9th August, 1866; and to avoid the necessity of a further reference, he will also report the debts of A. M. Huger to Allen S. Izard created between the 9th August, 1866, and the 1st January, 1867.

It is further ordered that the plaintiffs have leave to apply for a writ of partition or order for sale, or any further order necessary to carry this judgment into effect.

Allen S. Izard appealed on the following grounds:

### SEC. 1.—AS TO THE QUESTION OF PARTNERSHIP.

I. Because the association of Allen S. Izard, Joseph A. Huger and Arthur M. Huger in the purchase and cultivation and management of the business of the Clydesdale estate was essentially and substantially a partnership transaction, and they held and managed the said Clydesdale estate as partnership property, and neither of them had any other estate or interest therein than such as a partner has in partnership property, that is to say, an equal share in the surplus remaining after all debts of the concern are paid, as is plainly shown by all the facts and circumstances as proved in this case by the testimony.

#### BETWEEN THE PARTIES THEMSELVES.

1. The conception of the purchase was a joint adventure in which each obliged himself to put something in common in order to make therefrom in common a lawful profit.

2. The nature of the subject matter purchased, the union of land and negroes and agricultural implements as a whole, as one property and estate without any discrimination of interests.

3. The bid by one common agent, in the name of Mr. Izard only, for one price for the whole.

4. The liability of each one of the three *in solido* for the whole price and liability of the whole property for the whole price.

5. The written agreement made immediately upon the purchase is essentially a copartnership agreement, declaring the respective positions of each partner in its management.

6. The payment of the cash part of the purchase money by one agent without any indication of the manner in which it was contributed.

7. The positive testimony of the common agent,—who was from the beginning charged with the negotiation for the property at private sale, employed to bid at the public sale, with whom the written agreement was immediately deposited, who made every payment,—that it was a partnership, and that he always so con-

sidered it; and this corroborated by the production of his letters, written long before the controversies in this case, expressing the same view.

8. The testimony of A. M. Huger, uncontradicted by Joseph A. Huger, and the fact that both so represented their association with Izard to Cohen in 1866.

9. That Mr. Lowndes must have been so informed by the Messrs. Huger, when they purchased the Hamilton negroes, to warrant what is said in his letter of 2d January, 1866–1867.

As to third persons:

They were also recognized and dealt with as copartners in Savannah by persons dealing with them in reference to their Savannah River property, even when nothing but the plantation remained, as is proved by Cohen's testimony; and in Charleston by their factors, William C. Bee & Co., as is proved by Mr. Bee from first to last; and by Coffin & Pringle, factors of the testator; of the executors of his estate, and of Joseph A. Huger, as is proved by their entries in their books, and by Mr. Lowndes, in their purchase of the Hamilton negroes in 1858, on the faith and knowledge of which he became the surety to the bond to the trustees of Hamilton and wife.

SEC. 2.—As to the question of the mortgagee's titles:

II. That whether they were copartners or not, all who knew of the circumstances of their association were in equity bound to recognize that all the joint debts of the association should be paid before any one of its members could apply any part of the property to the payment of his individual debts.

III. That the parties who took the mortgages in these cases were fully aware of all the facts and circumstances which constituted the partnership or were necessary to a recognition of the equity that all the debts of the concern should be paid out of the common property before either of the associates could appropriate any part of it himself.

IV. The complainants, in order to establish their several and respective mortgages, are bound to show that they dealt with the mortgagors upon clear legal titles produced by them, or which they could have produced, and this neither of them has done or can do.

1.—As to the mortgage of Coffin & Pringle:

This mortgage expressly describes the title thus: "which said plantation is jointly owned by and was conveyed by the executors

of the late Daniel Elliott Huger to the said Joseph A. Huger, Arthur M. Huger and A. S. Izard, by a conveyance of date the day of January, in the year of our Lord one thousand eight hundred and fifty-six," yet no such conveyance has been produced or proved ever to have existed.

That had they referred to the conveyance mentioned in the decree in this cause by his Honor the Circuit Judge, it would have appeared by the recitals of this imperfect instrument that the defendant became the purchaser, at a public sale, at the price of $188,000, on account of himself and of Joseph A. Huger and Arthur M. Huger, parties to the said conveyance, and that the purchase money had been secured in due form to the uses of the testator's will. And, further, that the said conveyance had not then been recorded anywhere, and that the said conveyance, although purporting to be an indenture between the executors of D. E. Huger of the first part, and the defendant, A. S. Izard, of the second part, had never been executed or in any manner whatever acknowledged or recognized by the grantee, and therefore had never been operative or effectual as a conveyance of the title.

2d.—As to the mortgage to C. T. Lowndes:

This mortgage is entirely consistent with a partnership and with the equity growing out of the joint purchase and employment of the estate, as it is only of the mortgagor's " one-third interest in the plantation," as that interest must be the surplus after all joint or partnership debt or debts of the association have been paid; and to this defendant can make no objection, as the true intent of the original paper drawn by Mr. Petigru.

Lowndes, the mortgagee, however, claims that this "interest" is an estate in fee in one undivided third part of the land itself. This title he must deduce from the decree in *Huger* vs. *Huger*, or from the indenture referred to in his Honor the Circuit Judge's decree. The decree in *Huger* vs. *Huger* was made 27th January, 1857, and gave a lien upon the whole estate, *in solido*, for the purchase money, and only confirmed the sale upon the execution of a bond by the executors, who had purchased (the mortgagors in this case) within sixty days from that decree, and no proof whatever is offered that such a bond was ever given. This certainly was not a clear legal title upon the face of it.

If Lowndes claims under the indenture, it is liable to the same objections as stated in reference to the title of Joseph A. Huger when he gave his mortgage to Coffin & Pringle.

V. Give the benefit of both decree and indenture to both the mortgagees, and still no clear legal title in fee to one undivided third part of Clydesdale is shown in either of them.

The bill in the case of *Huger* vs. *Huger* was by all the executors against all the legatees and devisees of Judge Huger, C. T. Lowndes answering and admitting the allegations respecting the purchase of the plantation, agreeing with the recitals and conforming to the design of the indenture, but with more particularity in the statements of the bill.

1st. That the auctioneers set down "the Savannah River plantation, with all the negroes, stock and things of the nature of personal estate belonging to the premises, including seed rice not exceeding four thousand bushels," to A. S. Izard, at the sum of $188,000, he being the only bidder.

2d. That he, A. S. Izard, bid for the property on behalf of himself and the said mortgagors, two of the executors, complainants in said cause, Joseph A. Huger and Arthur M. Huger.

3d. That the complainants in that cause, executors of Daniel Elliott Huger, were willing to convey the said Savannah River property to a *trustee* for the use of the purchasers, to which the indenture conformed.

4th. The Circuit decree (in *Huger* vs. *Huger*) was "that the said sale be confirmed on the parties who were purchasers paying to the parties who were not purchasers their respective shares, with the accruing interest, according to the terms of the sale;" and it was further "ordered and decreed that the said Savannah River estate, as also the Wateree estate, stand pledged for the payment of the purchase money of each respectively and the accruing interest," which decree, upon appeal, was modified by the Appeal Court by decree announced 26th January, 1857, as follows: "It is therefore ordered that the said executors, the mortgagees, Joseph A. Huger and Arthur M. Huger, purchasers at their own sales as in the bill stated, do, within sixty days from the announcement of this decree, execute a bond to the Ordinary of this District, where the property is situate, for the purchase money as required by the Act, the *lien* given by the Circuit decree to remain the same as therein expressed."

5th. No proof whatever was before the Court that the requisite bond was ever given, and the legal title has never passed to the

purchasers, whatever equity they may have to have such title, and the indenture does not recite that such a bond was ever given, but only that "the purchase money aforesaid has been in due form secured to the uses of the testator's will," without any reference to the decree or to anything but the powers in the will.

VI. That His Honor erred in decreeing that defendant should account for rents and profits in favor of mortgagees.

VII. That His Honor erred in decreeing a writ of partition, with leave to sell the whole, upon recommendation of commissioners in favor of mortgagees against a joint owner of the fee.

Finally:

Whatever doubts may be on other points, the following are established without dispute:

1. That Izard, through the agency of Bee, bought at auction the Clydesdale estate, real and personal.

2. That the purpose of the purchase was a joint concern between Izard and his brothers-in-law, the Messrs. Huger, for the cultivation of rice crops for market, of which concern Bee & Company were to be and were the agents.

3. That subsequently other large joint purchases were made of personal property and added to the Clydesdale estate.

4. That at first the joint concern was very successful, and, through the agency of Bee & Co., the original purchase and the largest part of the subsequent purchases were paid for with joint funds, the product of the joint property and efforts of the joint concern. That afterwards the concern was unfortunate and fell in debt, by the failure of crops, for the cost of cultivation, and failed also to pay for one of the additional purchases of personal property.

5. That the questions now made here are, whether the property purchased for the joint concern and paid for as above should go to pay its joint debts or to pay the individual debts of the parties. What are the rights of creditors?

6. That neither of the parties nor the joint concern have ever had a legal estate or title in or to the original purchase nor anything more than an equitable estate therein, and neither could mortgage more than he had nor that which he had not.

Wherefore, it follows that the extreme force that can be given to the mortgages is that of assignments of the equitable interests of

the parties in the joint concern, and such assignments are subordinate to the rights of the creditors of the concern.

The complainant, C. T. Lowndes, also appealed from so much of the decree of the Circuit Court as holds that his mortgage has not priority over the debts of A. M. Huger to Allen S. Izard created between the date of the first mortgage of A. M. Huger to C. T. Lowndes and the 9th August, 1866, and directs an inquiry as to the date of the said first mortgage and as to the said debts on the following grounds :

1. That effect should be given to the mortgage of Mr. Lowndes as of its date, viz., the 6th November, 1865.

2. That as to debts of A. M. Huger to A. S. Izard created previous to the 6th November, 1865, Mr. Izard is not a subsequent creditor in relation to Mr. Lowndes's mortgage, and that such debts are not a proper subject of inquiry by the Referee.

3. That it is to be presumed as a matter of law that the first mortgage given by A. M. Huger to C. T. Lowndes was duly recorded.

The defendant, James R. Pringle, also appealed from so much of the decree of the Circuit Court as omits the debt due to the defendant and for providing for its payment in the same manner as the debt due to the plaintiffs is provided for.

The case was first argued in the Supreme Court at November Term, 1874, and by order of the Court was reargued at November Term, 1875.

The arguments were too voluminous to be inserted here, and a vast number of points and authorities were submitted to the Court.

*Campbell, McCrady,* for Izard.

*James Lowndes,* for C. T. Lowndes.

*Young, Wm. Alston Pringle, B. H. Rutledge,* for the executors.

April 5, 1876. The opinion of the Court was delivered by

WILLARD, A. J. The complainants in the respective bills above entitled seek to foreclose mortgages respectively given by Joseph A. Huger and Arthur M. Huger on a tract of land and plantation called Clydesdale; A. S. Izard, defendant, claiming that complainants have a mere equity, subject to a superior equity in himself.

Izard, in behalf of himself and Joseph and Arthur Huger, bid in Clydesdale plantation at an executor's sale and it was struck off to him.

The sale was for part cash and part credit. Immediately after the bid was made an agreement was made between the three to plant Clydesdale as a rice plantation. This agreement was carried into operation. On the completion of the purchase a deed was executed by the executors to Izard for the joint use of Izard and Joseph and Arthur Huger.

The title continued to stand in this form at the time the present suits were commenced. Izard and the Hugers incurred in connection with this joint business two debts, which Izard has been compelled to pay. Izard contends that whatever rights the complainants may have acquired under the mortgages they were subject to the liability of the property for partnership debts.

The first question to be considered is, what right it was competent for Joseph and Arthur to convey to third parties as it respects their interest in Clydesdale during the existence of the joint agreement and previous to the payment of the business debts. If it should appear that they could convey no more than an equity, subject to the payment of partnership debts, then the defendant, Izard, will be entitled to have preference over any demand that the complainants may be entitled to make to Clydesdale. This question depends upon the force and effect of the joint agreement, viewed in connection with the nature and situation of the property, the character of the joint business and the effect of the conveyance of the legal title to Izard, subject to trusts in favor of Joseph and Arthur. The purchase of the property by Izard, and the formation of the joint business, must be considered as concurrent events, embodying different parts of the same intention. The agreement was as follows :

"Articles of agreement between Allen S. Izard, Joseph A. Huger and Arthur M. Huger, joint owners of Clydesdale plantation and negroes, Savannah Back River, Beaufort District, South Carolina: Joseph A. Huger to be charged with management of the plantation. Messrs. Wm. C. Bee & Co., factors, of Charleston, under the advisement of Arthur M. Huger, to be charged with management of the accounts and supplies. All connection with the city of Savannah, Ga., to be avoided as far as practicable; if resorted to from necessity, the transactions to be always on the cash

basis. On all points involving the management or general inter-
ests of the concern Allen S. Izard will be required to act as adviser,
and, in case of difference between the other parties, to be umpire.

"Charleston, 9th January, 1856."

The proof of this agreement is questioned on the ground of the
uncertainty of the secondary evidence offered in regard to it, but
it is conceded that there was an agreement, and the testimony does
not show any conflict of memory as to its provisions. It must
therefore be regarded as sufficiently proven. The agreement sets
forth the plan of conducting the business and does not assume to
define the relations of the parties any further than to fix their
relative duties as it regards the conduct of the business.

It is of little importance to examine critically the force of par-
ticular words used in this instrument in order to discover the inten-
tion of the parties as to their general relations to the business. It
was not in the mind of the parties to set forth any such general
definition, and their selection of words and phrases was not made
with any such view. The question as to whether a partnership was
intended must be indirectly arrived at from the nature of the in-
tended business and the mode in which it was to be carried on.

It is correctly argued that the question of partnership is one of
intention. That does not mean, however, that the parties must
have directly and distinctly in mind the various legal consequences
attending the existence of partnerships relations; but having
adopted the means fitted to carry on their business, the law will
look to the nature of those means as an expression of the general
intention of the parties and declare accordingly whether the rela-
lation of partners exists between them.

The question of the existence of a partnership is complicated by
the fact that a scheme of business sometimes omits one or.the other
of the fixed characteristics of a partnership.

But when all are present, as in the case under consideration, no
difficulty exists requiring any·elaborate examination of the cases.

The ordinary elements of a partnership are a common stock, an
intention to prosecute, unitedly, one or more branches of industry,
and authority, power, mutually interchanged or specially delegated,
to manage and control the common stock for the common benefit.
The last named feature may be regarded.as the leading character-
istic of a partnership. Where property passes into a common stock
by the consent of its owner, the power of control over it is neces-
sarily modified, in order to secure the purposes of a common stock.

Something must be taken away from the power of independent control that each of the several owners possessed previous to its passing into the condition of a common stock. Either the parties must interchange as among themselves equal powers over the common stock, or they must place that power of control in some specialized hand or hands. In either case the power resulting from such an arrangement is representative, its peculiar characteristic being in the nature of a power of attorney of all to each or of all to some definite managing agency. A partnership in this respect closely resembles a corporation, but differs from it in another important respect, namely, that the power of control over the common stock of a partnership flows directly from the owners of such common stock, whether regarded as contributed to or created by the corporation; the powers over the common stock flow from the law of the corporation and indirectly from the corporators by the acceptance of that law. When these elements are all brought into distinct existence by the agreement, there can be no doubt of the intentions of the parties to unite as partners. Sometimes, however, the last named of these elements can only be made out by implication. This happens when the agreement develops the object of the partnership rather than the means of their attainment. In such cases it is very common to look into the intention of the parties as it regards community of profit and loss for the means of supplying such intention. The abstruse learning of the cases elaborately discussed by counsel is of importance where the intention of the parties is left to inference, but inapplicable to the present case, where that intention is covered by definite expressions. In the present case a common stock was created, which, leaving out of view any intent to impress that character upon the real estate, consisted of personal property, such as slaves, implements, &c. A business was indicated, namely, planting. Rice planting is known to have been intended from the nature of the plantation and the business subsequently pursued by the parties under agreement. The agreement expressly communicated to the several parties power over the common stock different from what each as an individual owner could have possessed. One was clothed with authority to manage the agricultural department of the business, which implied power to manage and control the whole common stock so far as might be required to carry out that branch of the business. Another was clothed with authority to control the mercantile part of

the business and a corresponding authority over the common stock. The third was to fill the important post of adviser to the others and of umpire between them in case of difference. More complete evidence of an intent to confer on the several parties representative powers, although of different kinds and classes as affecting the whole common stock, could not be afforded by any partnership agreement. We must conclude that the parties intended copartnership in planting Clydesdale by the use of the property purchased in the name of Izard, and such as should be otherwise contributed or produced, and by means of the credit of the copartnership. The last conclusion is necessarily implied from the clause prohibiting the use of credit in Savannah, clearly implying that credit was intended to be employed elsewhere; the motive for the exclusion of Savannah being, doubtless, local merely.

That which existed as common stock at the making of the agreement was the bid of Izard, in behalf of himself and his partners, for the real and personal estate constituting Clydesdale. The parties took possession, looking to the completion of title under the bid. It will not be necessary to go into the details of the proceedings to make title under the bid of Izard. A deed was made by the executors to Izard for the use of himself and his partners. It is said that Izard never in form accepted this deed; but it was executed and delivered for Izard's benefit, was in conformity to the terms of the purchase as far as appears, and possession was had of the property conveyed in conformity with it. At all events, assuming Izard's title to be derived through the deed presents the question in as favorable a light for the complainants as any other view that can be taken of the transaction, and conforms to their view of the case. In any case, if Joseph and Arthur ever obtained legal title, it was through either a use existing in their favor or under the operation of an estoppel, and in either case the result would be the same as it regarded the question to be considered.

It must be concluded that Joseph and Arthur considered the deed to Izard as a conveyance of the property and mortgaged accordingly, They do not appear to have made any effort to obtain from Izard a conveyance of the property, or such an instrument as would put them in possession of clear evidence of their occupying the position of tenants in common with Izard.

The fact just mentioned ought to be considered in connection with the fact that Clydesdale was not merely land and its appurte-

nances, but land and personalty united for the purpose of a particular business, and that it possessed in itself the means and appliances, hydraulic and mechanical, for rice culture, the value of which would be materially impaired by a partition. For the purpose of the business intended, it must remain a unit. Alienation by either of the partners of a part of the plantation would, we must assume, have broken up the basis of the business and defeated the object of the partnership agreement. A mortgage by one of them was placing power in the hands of a third person that might destroy the partnership business, without regard to the sufficiency of the partnership property to pay partnership debts. While the title was in Izard, as trustee for himself and his partners, the objects of the partnership were comparatively secure. No motive can be assigned for leaving it in his hands in such complete harmony with the conduct and known motives of the parties as that of maintaining a trust impressed with the objects and purposes of the copartnership.

It is true that the primary motive in making the deed one of trust in the name of Izard was probably this fact: that the names of Joseph and Arthur appeared in the deed as executors conveying to Izard, occasioning a seeming impropriety in making them grantees, so that they would appear to convey to themselves directly as individuals; but still the fact that the title was allowed to remain in Izard, without his being called upon to transfer it to them, is unexplained, except in the manner already pointed out.

The facts and circumstances manifest an unmistakable intention to leave the trust in existence to subserve the uses of the partnership. This being the case, the trust would continue to subsist while the partnership continued, and cannot be regarded as a naked trust liable to become executed under the statute.

Under this view of the case, Joseph and Arthur never had more than an equity, and could not convey by way of mortgage more than the equity so held, and the mortgage could only take the equity as it was in the hands of the mortgagor, impressed with the characteristics established by the agreement of the parties. In other words, the mortgagees could not claim to stand in the position of purchasers of the legal title without notice of an equity affecting it, but, with or without notice, would take such equity only as it stood in the hands of the mortgagor.

Columbia, November, 1876.

It remains, then, only to consider whether, according to the intention of the parties to the agreement, the equities of Joseph and Arthur were subject to partnership debts.

Much learning and ability has been displayed by counsel in presenting the law as applied to cases where land is sought to have impressed upon it the equitable character of assets for the payment of partnership debts; that doctrine is applicable to the present case. Its difficulties arise from the fact that it is an attempt to raise an equity against the clear right of dominion conferred by law on him who has the legal title to land. To create such an equity requires the presence of certain distinct elements that are not requisite where the parties have created the equity by their own act and a Court of equity is called upon to declare what characteristics and incidents were impressed upon it by such act of creation.

The whole question here is simply one of the intention of the parties, and is to be solved by keeping in mind the principles applied by equity in drawing such conclusions, prominent among which is the invariable assumption that parties intended to do that which was equitable. It was manifestly right and agreeable to equity that the interests of the partners should, in the first instance, stand as a fund to pay partnership debts, and that neither should, by any form of alienation, diminish the common fund for the payment of the common debts.

It is manifest, taking the whole evidence together, that the parties taking the securities set forth at the time when the obligations were incurred for which such securities were given did not intend to occupy the position of withdrawing from the common stock anything applicable to the payment of its debts.

That the planting interest was then prosperous and the individual interests of the partners in the common stock, over and above all partnership liabilities, was considered adequate security.

The evidence does not establish the claim that the consideration of the mortgages in either case was either an advance for the benefit of the partnership or for the payment of the land.

The creditors whose demand Izard satisfied were in equity entitled to go upon the whole common stock, embracing the equitable rights of Joseph and Arthur, and the mortgagees were subject to that right. Izard having advanced his own funds to pay the creditors is clothed with their equity.

The judgment must be set aside and the case remanded for an account of the partnership debts remaining unsatisfied, embracing the amounts actually paid by Izard in the settlement of the copartnership debts set forth in his answers and for a decree establishing priority in Izard and all other partnership creditors to the assets of the copartnership.

*Moses,* C. J., and *Wright,* A. J., concurred in the result.